IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 09-012-SLR |
| | ) | |
| LARRY KELLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

## I. INTRODUCTION

1. On January 27, 2009, a grand jury for the District of Delaware returned a one-count indictment with notice of forfeiture against defendant Larry Kelley, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (D.I. 10) Before the court is defendant's motion to suppress physical evidence and statements. (D.I. 14) Defendant asserts that law enforcement officials did not have reasonable suspicion to support an investigative stop and challenges the admissibility of statements obtained during or after his illegal search and seizure. (D.I. 19) An evidentiary hearing was conducted on May 6, 2008.[1] (D.I. 22) Although the matter was fully briefed, the government was ordered to file supplemental briefing to

---

[1]Testifying on behalf of plaintiff was Wilmington Police Department ("WPD") Patrol Officer Samuel Smith ("Smith") and WPD Sergeant John Drysdale ("Drysdale"). Robert Donovan ("Donovan"), an investigator with the Federal Public Defender's Office, testified on behalf of defendant. (*Id.* at 56)

address, factually and legally, defendant's argument with respect to seizure, including whether defendant was seized and, if so, whether the seizure was reasonable.[2] (D.I. 24; 14, 19, 20, 21, 25, 26, 27)  The court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACTS

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes the court's essential findings of fact.

1. On Sunday, December 28, 2008, at approximately 10:30 a.m., WPD Patrol Officer Smith[3] was on uniformed patrol in a marked police vehicle in the area of 23rd and Lamotte Streets, Wilmington, Delaware.  (D.I. 22 at 5-6, 37, 41)  Smith was riding in the patrol vehicle driven by his partner WPD Patrol Officer Coleman ("Coleman"), collectively ("the Officers").  The Officers were patrolling on a cold, windy day in an area known for high-crime, open air drug sales,[4] and where it is common for individuals to carry firearms.  (*Id.* at 6, 37-38)  During his career, Smith has made about 35 drug related arrests in this area.

2. As the Officers drove southbound on Lamotte Street, Smith observed, from about 30 feet away, a group of about ten black males ("the group").  (*Id.* at 8, 38; DX1)

---

[2]The court specifically ordered the government to address the narrow issue of seizure as raised in defendant's papers, and afforded defendant the opportunity to file a reply; accordingly, any additional arguments and/or issues included in said papers are beyond the scope of the order and will not be considered.

[3]Smith has been a WPD police officer for approximately five years and has participated in several hundred arrests, half of which were related to drugs.  (*Id.* at 4) About 20 of those drug-related arrests involved firearms.  Smith received six months of training at the Police Academy.  (*Id.* at 3)

[4]Smith testified that heroin, crack cocaine and marijuana are sold in the area. (*Id.* at 7)

The group noticed the patrol vehicle and two individuals made eye contact with the officers. (*Id.* at 10)  Those two individuals turned away from the group and walked, briskly, westbound on 23rd Street.  The rest of the group remained at the location. (*Id.* at 10)

3.  The two individuals, one wearing a black hooded sweatshirt with a black vest, black pants and black shoes and the other wearing a black jacket with tan pants, walked briskly, proceeding halfway up the block and westbound to Market Street.[5] (*Id.* at 11-13, 38)  Smith lost sight of them, but a few minutes later observed the two individuals on 24th Street, instead of back toward Lamotte Street.[6] (*Id.* at 14, 42-43)

4.  When the two individuals saw the Officers, they quickly turned around and defendant[7] made eye contact with Smith. (*Id.* at 15-16)  Defendant appeared nervous, with his eyes wide-open and an excited facial expression. (*Id.* at 16)  The patrol vehicle drove alongside the two individuals, pacing them for about 20-30 feet.  While walking, defendant turned around, several times, to look at the Officers. (*Id.* at 17, 45)

---

[5]Smith testified that he was surprised the two took this path because "it's common for them, when they are trying to elude us, to double back as we go around, [and] because it is common for us to actually go up Gordon Street and then loop back around on to 23rd Street since 23rd Street travels eastbound . . . . (*Id.* at 11-13)

[6]Smith opined that the two individuals "ran from that spot on 23rd Street around the block onto Lamotte Street and onto 24th Street . . . because it wouldn't have been a normal walk for somebody to walk that area that fast." (*Id.* at 15)

[7]Smith identified this individual as defendant. (*Id.* at 15-16)

5. Defendant and the individual stopped, conversed momentarily and, then, defendant turned quickly, walked onto the porch[8] of a row house located at No. 16 East 24th Street ("the row house") and knocked, lightly, on the front door. (*Id.* 17; GX1) The other individual continued westbound on 24th Street. (*Id.* at 17, 45-46)

6. Defendant continued lightly knocking on the front door and looking over his shoulder as the Officers exited their patrol vehicle. (*Id.* at 18, 46) Smith concluded that defendant's behavior was suspicious and surmised that defendant was not attempting to visit someone at the row house. (*Id.* at 17-20, 45, 54) Based on his experience, Smith concluded that defendant's conduct was indicative of someone carrying an illegal narcotic and trying to avoid police contact. More specifically, Smith testified that

> [i]t's common for anybody - that area, especially, for anybody that's normally holding any type of narcotic or doesn't want any contact with the police officers to quickly walk up to a porch, making it seem that they're going to visit somebody and just start knocking on the door, so the police officers will drive on by or just dismiss them.
> \*          \*          \*
> Yes. Like I said, I've spoken to several other officers, and it's common in that area.

(*Id.* at 18-19)

7. Smith approached the porch and asked defendant if he could speak with him. (*Id.* at 19, 47) Defendant did not reply. (*Id.* at 19) He continued knocking on the door and looking back at Smith and looking to the left and to the right. (*Id.* at 19-20, 47)

---

[8]The front of the row house has one door, a window to the left of the door and a small porch. The porch, approximately five by fifteen feet, has a brick wall, about three to four feet high. The wall, apparently, separates the row house from adjacent row home(s). (*Id.* at 18)

Based on his experiences with individuals fleeing from him, Smith concluded that defendant was looking for a way to flee from him. (*Id.* at 20)

    8.  Smith walked onto the porch and requested that defendant step away from the door and place his hands on the wall. (*Id.* at 21, 47)  Defendant did not verbally respond, but complied.  Defendant placed his hands on the wall while Smith commenced a pat-down frisk of defendant's outer clothing. (*Id.* at 21, 47, 48)  While frisking him, Smith felt his left hand "shaking pretty badly" and noticed the same hand was balled up in a fist. (*Id.* at 21, 47)  Smith did not find any illegal contraband on defendant during this frisk.[9] (*Id.* at 48)

    9.  Smith surmised that defendant was preparing to fight him.  For officer safety and defendant's safety, Smith asked defendant to remove his right hand from the wall in order to apply handcuffs.[10] (*Id.* at 22-23)  Smith testified that defendant asked the reason for the handcuffs since no contraband had been found during the frisk. (*Id.* at 22, 48)  Smith attempted to secure the handcuffs, however,  defendant pushed off the wall, knocking Smith off balance.

    10.  Smith pushed back against defendant and called Coleman for assistance. (*Id.* at 23)  Smith attempted again to apply the handcuffs, but defendant continued to resist. (*Id.* at 24)  Smith pushed defendant face down onto the ground and, repeatedly,

_____

    [9]Smith testified that this pat-down search was never completed because he stopped the search to place defendant in handcuffs because defendant exhibited behavior (shaking and balling of fist) that suggested defendant was preparing to fight Smith. (*Id.* at 21-23)

    [10]Smith further explained, "if there's a flight, it's quite possible that I could become injured as well as the defendant." (*Id.* at 23)

ordered him to stop resisting. (*Id.* at 24)  During the scuffle, defendant received a

laceration above the left eye brow that bled heavily and dripped all over the front of his

shirt. (*Id.* at 25)  Coleman arrived to assist; the Officers successfully applied the

handcuffs.  Defendant was placed under arrest for resisting arrest. (*Id.* at 24-25)

11.  Smith searched defendant's jacket pockets, the back of his pants and felt

around the front of his pockets. (*Id.* at 26, 49)  Because Smith did not have any

protective gloves with him and defendant was bleeding heavily from the laceration,

Smith did not conduct a thorough search. (*Id.* at 25-26)  Smith did not discover any

contraband. (*Id.* at 25)

12.  The Officers transported defendant to Wilmington Hospital for treatment of

his injury. (*Id.* at 26-27)  Defendant was placed in Room 22, a small, separate room in

the emergency room that WPD uses for prisoners. (*Id.* at 26-27, 49-50)  The room has

a bed, bench and a bar for securing handcuffed individuals. (*Id.* at 28)

13.  Sergeant Drysdale[11] arrived at the hospital to interview defendant.[12] (*Id.* at

29)  After interviewing defendant for about 10 minutes, Drysdale met with the Officers.

Smith told Drysdale that he was unable to conduct a complete search of defendant at

the scene, and that he suspected defendant was still in possession of something illegal.

(*Id.* at 29-30)

---

[11]He is a sergeant with the Safe Streets Program. (*Id.* at 61)

[12]WPD procedures require that, when an officer uses force in the field, a
sergeant is required to investigate. (*Id.* at 29)

14. Drysdale and the Officers returned to Room 22 and advised defendant[13] that he was going to be strip searched. They asked defendant his name, address and whether he had anything on him that they should know about.[14] (*Id.* at 30, 32, 50-51) Defendant did not appear to be under the influence of drugs or alcohol and appeared to understand the officers as they spoke to him. (*Id.* at 30-33, 35-36; GX4) Defendant did not complain of pain or make any requests to use the bathroom or for any food or water. (*Id.* at 33, 36)

15. Defendant, hesitantly, replied that he had a gun on his right hip area.[15] (*Id.* at 33, 51) The Officers removed defendant's shirt and pants and located the gun. (*Id.* at 33) The Officers administered Miranda rights. (*Id.* at 52) Smith could not recall whether defendant invoked or waived his Miranda rights.[16] After receiving medical treatment for the laceration, defendant was transported to the WPD Central. (*Id.* at 27, 35; GX4)

---

[13]Defendant was handcuffed and had not yet received any medical treatment.

[14]Defendant did not provide his real name or date of birth to the Officers at the time of his arrest. (*Id.* at 26-27, 31-36)

[15]Smith testified that, even if defendant had not informed the Officers about the gun, defendant would have been searched at the police station as part of booking and processing. (*Id.* at 33-34) Specifically, according to WPD protocol, when a person is arrested, even if injured, the individual is booked. (*Id.* at 34) As part of the booking process, the arrestee's property is removed and a very thorough search and pat-down (all clothing except undergarments removed) is conducted prior to the arrestee being placed in a holding cell. (*Id.*)

[16]Smith's police report does not indicate whether defendant waived his *Miranda* rights. (*Id.* at 52, 55)

16. Robert Donovan interviewed a female resident[17] of the row house. She told Donovan that she heard the commotion on the porch and saw Smith and defendant struggle. The woman said she was familiar with defendant through his family, but was not expecting defendant to arrive at the row house that day. (*Id.* at 58-59)

## III. STANDARD OF REVIEW

1. Once a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate, by a preponderance of the evidence, that the acts were constitutional. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974). The government bears the burden of showing, by a preponderance of the evidence, that any statements made to law enforcement were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

2. The court is charged with reviewing the credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence. *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir.1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005).

## IV. DISCUSSION

### A. The Stop

---

[17]Drysdale also interviewed this woman, as well as another woman, at the row house. (*Id.* at 63) Both denied knowing defendant. (*Id.* at 61- 63) Immediately after defendant's arrest, Smith spoke with an unidentified female resident who stated that she did not know defendant and that he had no reason to knock on her door. (*Id.* at 26)

1. The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures.[18] U.S. Const. Amend. IV. A seizure made pursuant to a warrant based on probable cause is generally reasonable. *Katz v. United States*, 389 U.S. 347, 356-357 (1967). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, __ U.S. ___, ___, 129 S.Ct. 1710, 1716 (2009) (quoting *Katz v. United States*, 389 U.S. at 357)). Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006).

2. A police officer may conduct a brief, investigatory stop whenever he has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000). "Reasonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, and only a minimal level of objective justification is

---

[18]"The initial step of a Fourth Amendment suppression analysis requires us to determine the timing of the seizure." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). The Fourth Amendment becomes relevant the moment the seizure occurs. *United States v. Brown*, 448 F.3d at 244. The seizure inquiry has two steps: (1) was there in fact a seizure; and, if so, (2) was that seizure reasonable. *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009). The parties agree that defendant was seized at the moment he submitted to Smith's command to place his hands on the wall. (D.I. 25, 26, 27)

necessary for a *Terry* stop." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quotations and citations omitted).

3. To determine whether a stop was justified, the totality of the circumstances surrounding the stop must be evaluated. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004); *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The totality of the circumstances includes the history of crime in the area, the location, the suspect's evasive or nervous behavior and the police officer's conclusions and inferences. *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

4. The court should defer to the officer's observations and judgments in reviewing the totality of the circumstances because officers "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Nelson*, 284 F.3d. 472, 482 (3d Cir. 2002); *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984). Deference is accorded to an "officer's judgment of whether criminal activity is taking place with an understanding that 'whether an officer has reasonable suspicion to warrant a stop . . . is often an imprecise judgment.'" *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006).

5. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," the law does not require officers "to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently

suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124

(2000) (citation omitted); *United States v. Goodrich*, 450 F.3d 552, 561-562 (3d Cir.

2006) ("the lateness of the hour of the stop further supports the inference of criminal

activity, especially when considered alongside the area's reputation for criminal

activity."). Moreover, with respect to unprovoked flight in high crime areas, the

Supreme Court has concluded:

> Headlong flight - wherever it occurs - is the consummate act of evasion:
> It is not necessarily indicative of wrongdoing, but it is certainly suggestive
> of such. In reviewing the propriety of an officer's conduct, courts do not
> have available empirical studies dealing with inferences drawn from
> suspicious behavior, and we cannot reasonably demand scientific certainty
> from judges or law enforcement officers where none exists. Thus, the
> determination of reasonable suspicion must be based on commonsense
> judgments and inferences about human behavior.

*Wardlow*, 528 U.S. at 124-125; *see United States v. Bonner*, 363 F.3d 213 (3d Cir.

2004). Further, "nervous, evasive behavior is a pertinent factor in determining

reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citing *United States v. Brignoni-*

*Ponce*, 422 U.S. 873, 885 (1975)).

6. Considering this authority against the totality of the circumstances of record,

the court finds that Smith's stop of defendant was supported by reasonable suspicion.

The court credits Smith's testimony and concludes it was reasonable to infer that

defendant was engaged in criminal activity based on his presence in a high-crime area

and subsequent flight, as well as his nervous behavior after initially spotting the

Officers. Defendant's nervous behavior continued as the Officers drew closer, e.g.,

reflected by defendant's repeated glances to the Officers, knocking on the row house

door, failing to verbally respond to questions and looking to his right and left as if trying

11

to flee from Smith.  Considering these factors in tandem, the court finds the stop of

defendant was supported by reasonable suspicion to suspect defendant was engaged

in criminal activity.

7.  Having found reasonable suspicion to justify the stop, the issue becomes

whether defendant's detention became unlawful after Smith conducted a frisk and

found no evidence of criminal activity.  The record reflects that Smith did not complete

his pat-down of defendant while on the porch because defendant's conduct, i.e.,

shaking and clenching his fist as if ready to fight, caused Smith to stop the search to

apply handcuffs for safety reasons.  Smith's application of handcuffs was reasonable.

*See United States v. Coppedge*, No. 08-075-SLR, 2008 WL 4874158 at *4 (D. Del.

Nov. 10, 2008).  Moreover, Smith was not able to resolve the ambiguity regarding

defendant's suspicious behavior because of defendant's own conduct.  The quickly

unfolding chronology of events that followed Smith's attempt to apply handcuffs reflect

probable cause to arrest defendant for resisting a Terry stop under Delaware law, 11

Del. C. § 1257(b).[19]

### B. The Statement, the Gun and the Inevitable Discovery Doctrine

1.  Defendant contends that the gun recovered should be suppressed "based on

the officers' violation of [his] Fifth Amendment rights." (D.I. 19)  Specifically, because

he was not provided with his *Miranda* warnings prior to questioning, defendant asserts

---

[19]11 Del. C. § 1257(b) provides that a person is guilty of resisting arrest "when
the person intentionally . . . attempts to prevent a peace officer from effecting an arrest
or detention of that person."

that the gun recovered after his "coercive, custodial interrogation must be suppressed." (*Id.* at 18-19)

2. The government stated at the evidentiary hearing that it will not seek to introduce defendant's statement in its case-in-chief at trial.   (D.I. 22 at 2-3)  The gun is admissible, argues the government, because the statement was voluntary and the law is clear that "the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued." *United States* v. *DeSumma,* 272 F.3d 176, 180-81 (3d Cir. 2001).

3. The Fifth Amendment of the United States Constitution prohibits the prosecution from introducing a defendant's statements made during a custodial interrogation, unless he is advised of the procedural safeguards protecting his right against self-incrimination. *United States v. Yamba,* 407 F. Supp.2d 703, 717 (W.D. Pa. 2006).  To that end, the United States Supreme Court created the *Miranda* warnings for law enforcement officers to follow prior to interrogation of a suspect in order to combat the compelling pressures inherent in custodial police interrogation and to permit an opportunity to exercise the privilege against self-incrimination guaranteed by the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436 (1966).  Before any questioning, the suspect must be informed that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Id.* at 445.  If a suspect invokes his right to counsel, all questioning by the police must stop until counsel has been made

available to the suspect, unless the suspect initiates conversations with the police. *United States v. Velasquez,* 885 F.2d 1076, 1084 (3d Cir.1989).

4. Statements obtained in violation of *Miranda* precepts, even though the statements may have been voluntarily given, are inadmissible to prove guilt at trial. *Michigan v. Mosely,* 423 U.S. 96 (1975); *Miranda,* 384 U.S. at 458-59. "Any statements or testimonial acts made prior to the administration and voluntary waiver of *Miranda* rights are irrefutably presumed involuntary and may not be used in the prosecution's case-in-chief." *United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir.2008).

5. Statements made to police officers are inadmissible evidence if the statements are involuntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). A statement is given voluntarily if the totality of the circumstances reflect that it is the product of free and unconstrained choice. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). Factors to consider in determining whether a suspect's statement is voluntarily given include whether his will is overborne or his capacity for self-determination is impaired and his background and experience, including those with the criminal justice system. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005); *Dickerson v. United States,* 530 U.S. 428, 434 (2000) (totality of circumstances includes the characteristics of the accused and the details of the interrogation). "A necessary predicate to a finding of involuntariness is coercive police activity" and "there must be some causal connection between the police conduct and the confession." *Jacobs,* 431 F.3d at 108.

6. The record reflects that defendant, handcuffed in a holding cell at the hospital, awaiting treatment for a laceration that at one point "was bleeding pretty good"[20] and without the benefit of *Miranda* warnings, was questioned by the Officers. After being told that he would be strip-searched and asked whether he had anything to tell the Officers, defendant told the officers he had a gun on his hip. While there is no evidence that the Officers applied or threatened physical force in order to prompt defendant's statement, the court cannot conclusively conclude that the cumulative effect of the totality of circumstances did not render the statement involuntary. Nevertheless, the court finds that the gun is admissible under the inevitable discovery doctrine.

7. The inevitable discovery doctrine provides that, "[i[f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Nix v. Williams*, 467 U.S. 431, 444 (1984). To satisfy the requirements of the inevitable discovery doctrine, the government must prove, by a preponderance of the evidence, that "the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Vasquez De Reyes* , 149 F.3d 192, 195 (3d Cir. 1998).

---

[20]In describing the injury, Smith testified that "[defendant] was bleeding pretty good from the head area, from the brow area. Blood was all down his - the front of his shirt. It was on his pants. He was wiping it all over his - both sides of his jacket." (D.I. 22 at 25)

To that end, the court is not permitted to speculate as to potential developments that might had led to the discovery of the evidence.  Rather, the court must focus on "demonstrated historical facts capable of ready verification or impeachment."  *Id.* (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)).

8.  The court finds that the government has carried its burden to prove that the gun would have been discovered when defendant was searched pursuant to WPD's booking procedures.  Smith testified, uncontradictedly, that WPD procedures require an arrested person, even if injured, to be booked on his charges.  (D.I. 22 at 33-35)  The arrestee's property, including all clothing, jewelry, belts, shoe laces, are removed.  Once the arrestee is in undergarments, a very thorough pat-down search is performed before the arrestee is placed in a holding cell.  At this point in the WPD booking procedure, the court concludes, the discovery of the gun would have been inevitable.

## IV. CONCLUSION

At Wilmington this 16th day of October, 2009,

IT IS ORDERED that:

1.  Defendant's motion to suppress is denied.  (D.I. 14)

2.  A telephonic status conference is scheduled for **Monday, October 26, 2009** at **8:30 a.m.**, with the court initiating said. call.

3.  The time between this order and the telephone conference shall be excluded under the Speedy Trial Act in the interests of justice.  18 U.S.C. § 3161(h)(8)(A).

United States District Judge